**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**(Civil Division)**

_____

)
ARLANCIA WILLIAMS,                                )
1905 Lake Forest Drive                            )
Upper Marlboro, MD 20774,                         )
                                                  )
    Plaintiff,                                    )          Civil Action No. _____
                                                  )
        v.                                        )
                                                  )
WASHINGTON METROPOLITAN                           )
AREA TRANSIT AUTHORITY,                           )          **Jury Requested**
600 Fifth Street, N.W.                            )
Washington, DC 20001,                             )
                                                  )
    Defendant.                                    )
_____ )

## COMPLAINT

**COMES NOW** Plaintiff, Arlancia Williams (hereinafter "Plaintiff" or "Ms. Williams"),
by and through her undersigned counsel, and sues Washington Metropolitan Area Transit
Authority (hereinafter "WMATA" or "Defendant"), and for cause of action states, as follows:

## NATURE OF THE CASE

1.      Plaintiff Arlancia Williams (hereinafter "Plaintiff" or "Ms. Williams") brings this
civil action pursuant to Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), as
amended, 42 U.S.C. § 2000e, *et seq.*, for relief from Defendant's sexual harassment and
discriminatory conduct towards Plaintiff on the basis of her gender, as well as Defendant's
retaliation for Plaintiff's protected activity.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331, as it asserts a claim that arises under laws of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*.

3. Venue is appropriate and based on the fact that a substantial part of the actions complained of are the result of actions and the employment practices of Defendant, a municipality within the District of Columbia. *Id.*

## EXHAUSTION OF REMEDIES

4.      On August 19, 2014, Plaintiff timely contacted the United States Equal Employment Opportunity Commission ("EEOC") and filed a complaint against WMATA alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et. seq.*, and the Rehabilitation Act, identified as EEOC Charge No. 570-2014-01897.

5.      Plaintiff has exhausted all of her administrative remedies.

6.      On or about August 19, 2014, Plaintiff submitted a Form 5 Charge to the EEOC alleging that WMATA had violated Title VII of the Civil Rights Act of 1964, as amended, due to discrimination based upon gender (female), sexual harassment, and retaliation for filing a complaint of sexual harassment, a protected activity.

7.      On April 28, 2016, Plaintiff received a letter from the Equal Employment Opportunity Commission stating that it has received Plaintiff's request for a Notice of Right to Sue in the above referenced charge, and that your request has been forwarded to the U.S. Department of Justice (hereinafter "DOJ").

8.      In June 2016, the DOJ mailed Plaintiff a "Notice of Right to Sue," which has not yet been received, but provided her with 90-days from receipt of that notice to file her federal lawsuit.

9.      On August 11, 2016, Plaintiff timely filed her action within ninety (90) days of receipt of the EEOC's "Notice of Right to Sue."

10.     Plaintiff hereby timely files the instant amendment to her Complaint filed on August 11, 2016.

## PARTIES

11.     Plaintiff is currently domiciled at 1905 Lake Forest Drive, Upper Marlboro, MD 20774.  Plaintiff is a resident of the State of Maryland and a United States citizen.

12.     Defendant, WMATA, is an instrumentality created by Congress to operate a mass transit system in the District of Columbia and the surrounding Metropolitan area and is subject to suit for the negligent, discriminatory, wanton, willful or wrongful acts and/or omissions of its employees or agents and is therefore liable, pursuant to the doctrine of *Respondeat Superior*.

## FACTUAL BACKGROUND

13.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs, as if fully set forth herein.

14.     Plaintiff was hired by Defendant in 2011 as a bus operator.

15.     In or around January 2014, Plaintiff was hired as a Service Operations Manager (hereinafter "S.O.M.").  Her first line supervisor was former Assistant Superintendent Alfonzo Walton (hereinafter "Mr. Walton").

## Sexual Advances & Harassment by Supervisor

16.     On December 30, 2013, at the first meeting Plaintiff attended in the department, Mr. Walton asked Plaintiff for a hug.  Plaintiff replied, "No, I am married, my husband is Antawan Williams."   Mr. Walton responded, "Ain't nobody thinking 'bout no Antawan."

17.     In or around March 2014, while attending the funeral of a fellow bus operator, Mr. Walton instructed Plaintiff to "Hurry up and give me a hug before Antawan comes over here."  Plaintiff replied, "No," and Mr. Walton responded, "Woman, ain't nobody thinking about no Antawan."

18.     In or around April 2014, Plaintiff attended a meeting at the Shepard Parkway Division.  While Plaintiff was speaking with Assistant Superintendent Norman Williams, Mr. Walton came over and asked, "Where is my hug?"  Plaintiff replied, "No," and Mr. Walton again responded, "Ain't nobody thinking 'bout no Antawan."   When Plaintiff got upstairs, she sat down and put her sweater on the seat next to her.  Mr. Walton moved Plaintiff's sweater and proceeded to sit down in the seat next to her.  Plaintiff told Mr. Walton she was saving the seat for her husband, Mr. Antawan Williams, Mr. Walton responded, "I'm getting tired of this husband and wife bullshit."

19.     When Plaintiff began working at the Four Mile Division, Mr. Walton called her daily, for no reason, to hassle her about work.  Mr. Walton would call Plaintiff on her radio, requesting that she call his cellular phone.  When Plaintiff reached Mr. Walton on his cellular phone, he asked her how she was going to handle certain situations despite the fact that she did not request any help.

**Vacation Request**

20.     On or around June 29, 2014, Plaintiff attended another meeting at the Shepard Park Division, where the employees were told if they had vacation time they should clear it with their Assistant Superintendents.  As both of Plaintiff's Assistant Superintendents – Norman Williams (hereinafter "Mr. Williams") and Mr. Walton – were present at the meeting, she informed them of the vacation she had previously planned and paid for before starting with the department.  Both Mr. Williams and Mr. Walton approved Plaintiff's vacation together the day of the meeting.

21.     However, the next morning, on or around June 30, 2014, Mr. Walton called Plaintiff on the phone, yelling "How are you going to just pick vacation without asking first? How do you know I was going to let you go?"  Plaintiff responded that she believed the vacation was approved the previous day at the meeting, to which Mr. Walton replied that he needed to see a copy of Plaintiff's hotel reservation, despite the vacation being approved.  Plaintiff complied and sent Mr. Walton a copy of her hotel confirmation.  Mr. Walton noticed that Plaintiff was traveling alone, and commented, "If you were my wife you wouldn't be going nowhere by yourself."

**Additional Comments**

22.     Plaintiff became aware that there was a new project starting in Virginia at the Four Mile Division and that the Agency was recruiting seasoned managers.  Assistant Superintendent William Proctor (hereinafter "Mr. Proctor") suggested Plaintiff's husband, Antawan Williams.  Mr. Proctor informed me that Mr. Walton responded, "Hell no, I'm tired of this husband and wife bullshit, they ain't coming out here with that shit."

**Training Within Other Division**

23.     When Plaintiff began training in the Four Mile Division with Manager Tammy Wright, Mr. Walton would stare at Plaintiff's backside while she walked by him.    Manager Wright instructed Mr. Walton to stop doing so before Plaintiff's husband finds out, to which Mr. Walton mumbled something back in response.

24.     The next day, Superintendent Darlene Harrington (hereinafter "Ms. Harrington") informed Plaintiff that Mr. Walton informed her that Plaintiff was training with the Four Mile Division on her days off.   Ms. Harrington forbade Plaintiff from doing so in the future, instructing her that she should not be in the division training for another job.

**Distress Over Returning To Work**

25.     On or around July 8, 2014, the last day of Plaintiff's vacation, Mr. Walton emailed her at 9:55 p.m.  Before returning to work the next day, Plaintiff began to feel distressed about returning to work due to Mr. Walton's unwanted advances and derogatory tone when speaking with her.

**Reporting Supervisor's Conduct**

26.     On or around July 9, 2014, at approximately 5:30 p.m., Plaintiff reported Mr. Walton's actions to acting Superintendent Linda Pinkard (hereinafter "Ms. Pinkard").   While Plaintiff was talking with Ms. Pinkard about Mr. Walton's actions, Mr. Walton began calling Plaintiff's cellular phone.   Ms. Pinkard instructed Plaintiff not to answer his call, and to communicate with any of the other five (5) Assistant Superintendents until the matter is resolved.

27.     On or around July 10, 2014, at approximately 9:11 a.m., Mr. Walton began calling Plaintiff's cellular phone.   Plaintiff elected not to answer Mr. Walton's calls. Immediately thereafter, Mr. Walton started calling Plaintiff via her handheld radio, yelling "116

to 276!" Plaintiff did not answer these calls either. Instead, Plaintiff texted Mr. Walton, stating "Mr. Walton, I hear you, I am not comfortable talking with you anymore. I will call another Assistant on duty. If you have any questions, call Ms. Pinkard." However, Mr. Walton continued to call Plaintiff on her radio in a derogatory tone.

28.     Assistant Superintendent Tyrus Dowtin (hereinafter "Mr. Dowtin") began calling Plaintiff's unit number as well via handheld radio. Plaintiff called Mr. Dowtin several times to no avail. Manager Terri Norris (hereinafter "Ms. Norris"), or Unit #160, responded, "160 to 116. Is there anything I can assist you with?" Mr. Dowtin responded in a derogatory tone, "No, we want 276!"

29.     Plaintiff then called Assistant Superintendent Clarissa Washington (hereinafter Ms. Washington"). Mr. Walton answered Ms. Washington's phone and said, "What you calling Dowtin for, he can't help you, don't call Dowtin!" Plaintiff asked to speak with Ms. Washington, Walton responded, "NO! You aint talking to nobody woman! You don't talk to nobody else but me! . . . You hear what I said woman? I am talking to you. As a matter of fact, you need to come see me right now." Again, Plaintiff asked to speak with Assistant Superintendent Washington. Mr. Walton responded, "Didn't I say you don't talk to nobody but me? I'm your boss, you need to come see me right now!" Plaintiff informed Mr. Walton that she was going to report the incident to Director Dana Baker, and immediately hung up the phone.

30.     Within five (5) minutes of the incident, Ms. Washington returned Plaintiff's call. Plaintiff asked Ms. Washington if she heard any of the incident, to which Ms. Washington replied that she hadn't. Plaintiff informed Ms. Washington of the specifics of the incident, and informed Ms. Washington that she was en route to report the situation.

31.     When Plaintiff arrived at the CTF building, Ms. Pinkard asked her to write a letter detailing the specifics of the incident.   While Plaintiff was writing her letter, Assistant Superintendent James Jackson stuck his head in the door and said, "That's right, burn him up. He has a history of sexual harassment and he keeps getting away with it."

32.     Plaintiff then reported the incidents to Director Dana Baker (hereinafter "Director Baker").  When Plaintiff informed Director Baker about how Mr. Walton emails her at 10:00 p.m., Director Baker asked Plaintiff for her work schedule, to which Plaintiff responded that she works 5:30 a.m. to 9:30 a.m. and 3:00 p.m. to 7:00 p.m.  Director Baker stated to Plaintiff that she was furious because Mr. Walton had lied to her, and asked Plaintiff what she wanted to happen.   Plaintiff indicated to Director Baker that she simply wanted Mr. Walton to stop harassing her and have a different Assistant Superintendent so she can stay at Ballston.

33.     On or about July 11, 2014, Director Baker sent Plaintiff an email stating that, as a manager, she was required to report the incident to the Equal Employment Opportunity Commission, and that she had re-assigned Mr. Walton to the Bladensburg Division to supervise Plaintiff's husband, Antawan Williams.

**Pick Selection**

34.     On or about July 15, 2014, there was a new "pick selection" to take place, where managers pick runs and new shifts according to seniority in the department.  The results were scheduled to be revealed on July 18th, and the new shift to start July 20, 2014.

35.     On the new pick, there were four (4) accident cars per division.  In a prior meeting, Director Baker said that one of the perks to anyone who picks an accident vehicle would have an early shift and the whole weekend or part of a weekend off.

36.     On the day of the pick, Manager Terri Norris stated to Plaintiff that Mr. Walton informed her that he "couldn't stand [Plaintiff]" and that "it didn't matter what [Plaintiff] picked" because he was sending her to the Northern Division on a late shift, that she wouldn't be working any more overtime, and that she would never see her husband again.  Ms. Norris also stated that Mr. Walton commented that he was going to "have the last laugh," and that he "had something waiting for [Plaintiff]" when she got there.

37.     Immediately thereafter, Plaintiff began to feel nervous and threatened.  She informed her husband, who instructed her to calm down because he was sure that Director Baker would never allow such a thing to happen under her supervision.

38.     The day before the pick came out, an email was sent to all the Managers stating that Director Baker instructed them to make changes, and that the Assistant Superintendents were now picking the shifts.

39.     On or around July 18, 2014, the pick was published.  As it turns out, Plaintiff was being sent to the Northern Division to work late, just as Mr. Walton had promised.  Plaintiff immediately notified Director Baker via text, several emails, and voicemails.

40.     On or around July 19, 2014, Plaintiff began to experience chest pain, sweats, and nausea.  The next day, on July 20, 2014, Plaintiff called Assistant Superintendent Dowtin, who did not answer immediately.  When Mr. Dowtin finally called Plaintiff back, she informed him that she was not reporting to work due to stress-related symptoms.

41.     On or around July 21, 2014, at approximately 4:45 p.m., Director Baker contacted Plaintiff.  Plaintiff informed Director Baker that Mr. Walton had purposely picked a run that would not allow her to work overtime.  Plaintiff also informed Director Baker that the accident car that Mr. Walton had assigned her to was originally off on Saturday and Sunday with an

earlier schedule.  Lastly, Plaintiff informed Director Baker that Mr. Walton threatened her and said that he had something waiting for her when she got there.

42.     Plaintiff was troubled to learn that Director Baker allegedly had picked her run because she "needed to learn how to do accidents."  Plaintiff informed Director Baker that she had previously received an evaluation from her direct supervisor stating that she was "fully knowledgeable, a role model, and excellent at doing accidents."

43.     Plaintiff asked Director Baker how she would know, due to the fact that it is highly unusual for a director to be involved with picks.  In fact, based upon information and belief, it is outside of the chain of command for a Director to select runs, and Director Baker did not select any other SOM's shifts on their behalf.

44.     Director Baker responded in an angry tone:  "Since you can't work under the stress from being harassed, maybe this isn't the job for you.  Maybe I need to find someone to take your place."

45.     Ms. Sabrina Short informed Plaintiff that Dana Baker stated, "She is so ignorant making complaints in-house, she is too ignorant to know she needs to take it outside of the company. I don't care who she complains to as long as it's here at WMATA."

46.     Immediately following this incident on July 21, 2014, Plaintiff's stress-related symptoms worsened, and she did not return to work until her former boss offered her a different position.

47.     However, because Mr. Walton was still an Assistant Superintendent, she would still have to report to him if she ever had to call in sick or be questioned regarding an incident or accident.  Plaintiff still receives emails from Mr. Walton requesting responses related to work.

48.     On or about January 12, 2015, Plaintiff returned to her previous job.

**COUNT ONE**
**Sexual Harassment**
42 U.S.C. § 2000e-2(a)(1)
(*Quid Pro Quo*)

49.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

50.    Defendants is s "person" within the meaning of 42 U.S.C. § 1983.

51.    At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

52.    Plaintiff is a member of a protected class, as she is a female.

53.    Defendant, by and through their agents, made unwelcome and unwanted sexual advances and sexual comments to Plaintiff because of her sex.

54.    Defendant conditioned Plaintiff's receipt of job benefits on their acquiescence to those sexual advances.  When Plaintiff refused to acquiesce, demonstrating that such advances and comments were unwelcome, she suffered tangible adverse employment actions.

55.    Defendant and Defendants' agents were acting in the course of and in the scope of their employment when they sexually harassed Plaintiff.

56.    The unwelcome sexual advances made by supervisors, Defendants and their agents toward Plaintiff constitute sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

57.    Defendant's conduct constitutes sex discrimination in violation of Plaintiffs' right to equal protection under the Fifth Amendment to the United States Constitution.

11

58.     Defendant had notice and knowledge of unlawful conduct by Defendants and, through their failure to remedy and prevent such violations of law, have established ongoing and pervasive sexual harassment as the custom and policy of the Agency.

59.     Defendant had notice and knowledge of unlawful conduct by Defendants and, through their failure to remedy and prevent such violations of law, have demonstrated deliberate indifference to the risk that such activity would result in constitutional violations.

60.      Defendant, implicitly or explicitly, with intent and knowledge of the foreseeable consequences, condoned, authorized, or ratified the conduct of their agents, promoted or permitted a working environment where such conduct was tolerated, condoned or encouraged, and systematically violated their own purported policies prohibiting sexual harassment in the workplace.  Such actions were taken by or with the knowledge of WMATA officials. Defendant and their agents have been deliberately indifferent to the unlawful and unconstitutional activity that occurs at the Agency.

61.     Due to Defendant's actions, Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering and such impact is on-going and permanent in nature.

62.     Plaintiff has incurred lost wages and loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

**COUNT TWO**
**Sexual Harassment**
42 U.S.C. § 2000e-2(a)(1)
(*Hostile Work Environment*)

63.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

64.     Plaintiff has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

65.     Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

66.     At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

67.     Plaintiff is a member of a protected class, as she is a female.

68.     Defendant discriminated against Plaintiff because of her gender in violation of Title VII, 42 U.S.C. § 2000e-(2)(a), by engaging in, tolerating or failing to prevent the gender-based harassment alleged herein and by failing to take affirmative action to correct and redress these unlawful employment practices.

69.     During Plaintiff's employment, Mr. A. Walton, subjected Plaintiff to a barrage of offensive and unwelcome comments.  Plaintiff clearly indicated that the conduct was unwelcome.  Plaintiff did not solicit or incite the conduct and she perceived the conduct to be offensive and/or undesirable.

70.     This conduct and other incidents of harassment described above were because of Plaintiff's gender.

71.     The conduct suffered by Plaintiff was sufficiently pervasive and/or severe to alter and did alter a condition of Plaintiff's employment and created an abusive working environment.

72.     Plaintiff was detrimentally affected by the conduct and such conduct would have detrimentally affected a reasonable woman in Plaintiff's position.

73.     The Defendant knew or should have known of the harassment described herein and Mr. Walton's propensity to engage in such gender-based harassment and failed to implement prompt, appropriate or corrective action.

74.     The harassment directed at Plaintiff was either intended to cause her severe emotional distress or was perpetrated with malice or reckless indifference to the likelihood that it would cause such distress. Defendant is, therefore, liable to Plaintiff for all damages proximately resulting from the distress she has suffered relating to the conduct of Defendant.

75.     Due to Defendant's actions, Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering and such impact is on-going and permanent in nature.

76.     Plaintiff has incurred lost wages and loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

**COUNT THREE**
**Gender Discrimination**
42 U.S.C. § 2000e-2(a)(1)
(*Female*)

77.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

78.     Plaintiff has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

79.     Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

80.     At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

81.     Plaintiff is a member of a protected class, as she is a female.

82.     Defendant discriminated against Plaintiff because of her gender in violation of Title VII, 42 U.S.C. § 2000e-(2)(a), by engaging in, tolerating or failing to prevent the gender-based harassment alleged herein and by failing to take affirmative action to correct and redress these unlawful employment practices.

83.     During Plaintiff's employment, Mr. A. Walton, subjected Plaintiff to a barrage of offensive and unwelcome comments.  Plaintiff clearly indicated that the conduct was unwelcome.  Plaintiff did not solicit or incite the conduct and she perceived the conduct to be offensive and/or undesirable.

84.     This conduct and other incidents of harassment described above were because of Plaintiff's gender, and Plaintiff did not see Mr. Walton or others harass the male WMATA employees in the manner she was being harassed.

85.     The harassment directed at Plaintiff was either intended to cause her severe emotional distress or was perpetrated with malice or reckless indifference to the likelihood that it would cause such distress. Defendant is, therefore, liable to Plaintiff for all damages proximately resulting from the distress she has suffered relating to the conduct of Defendant.

86.     Due to Defendant's actions, Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering and such impact is on-going and permanent in nature.

87.     Plaintiff has incurred lost wages and loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

**COUNT FOUR**
**Retaliation Based Upon Protected Activity**
42 U.S.C. § 2000e-2(a)(1)
(Reprisal)

88.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

89.     Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

90.     At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

91.     Plaintiff has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

92.     Plaintiff complained verbally and in writing to WMATA management and officials regarding her belief that she was being subjected to sexual harassment and discriminatory conduct.

93.     Defendant subjected Plaintiff to the aforementioned adverse employment actions because of her participation and opposition to unlawful and discriminatory employment practices in violation of Title VII, Section 1983.

94.     The adverse retaliatory actions to which Plaintiff has been subjected are a direct result of Plaintiff having previously engaged in protected EEO activity.

95.     Similarly situated employees (no known prior EEO activity) were not subjected to the same, similar, or any other adverse treatment.

96.     Other employees who were similarly situated, but members of a different protected class than Plaintiff, have received different terms and conditions of employment.

97.     Defendant's unlawful conduct has created a climate of fear and intimidation for Plaintiff and other employees, which creates a chilling effect upon other employees' willingness to engage in protected activity.

98.     Defendant's unlawful conduct negatively impacted the terms, conditions, and privileges of Plaintiff's employment.

99.     Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her participation and opposition to Defendant's discriminatory conduct.

100.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

101.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

102.    Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering.

103.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

a.  Order the Defendant to reassign Plaintiff to a new position with new first-line supervision;

17

b.   Order the Defendant institute a policy and procedure to be implemented against discrimination;

c.   Equal Employment Opportunity training for Defendant and the supervisory officials at issue herein;

d.   Supervisory training for the supervisors at issue herein; and

e.   Award compensatory damages in excess of Two Hundred Thousand Dollars ($200,000.00);

f.   Award medical costs and expenses incurred as a result of Defendant's unlawful conduct;

g.   Award lost wages;

h.   Award back pay and benefits, with interest;

i.   Award future wages;

j.   Award reasonable attorney fees, costs, and expenses incurred for this action;

k.   Award equitable, declaratory, and injunctive relief; and

l.   Award such other and further relief as this Honorable Court deems just and proper.

## Equitable Relief

104.   Plaintiff hereby incorporates, by reference hereto, the facts, law, and/or allegations contained within the preceding paragraphs, as fully set forth herein.

105.   Because of the actions alleged herein, the continued employment of the supervisors at issue herein without training in equal employment opportunity law, rules and regulations, clear and present dangers to the employees of Defendant and could result in further illegal actions on the party of Defendant, by and through its agents, servants, and employees.

## JURY DEMAND

106.    Pursuant to Fed. R. Civ. P. 38, Plaintiff demands trial by jury on all issues so triable.

August 11, 2016                               Respectfully submitted,


                                    By: */s/ Donna Williams Rucker*_____
                                         Donna Williams Rucker (D.C. Bar 446713)
                                         Deputy Managing Partner
                                         Tully Rinckey, PLLC
                                         815 Connecticut Ave., N.W.,
                                         Suite 720
                                         Washington, DC 20006
                                         (202) 787-1900
                                         (202) 640-2059
                                         DRucker@fedattorney.com

                                         *Counsel for Plaintiff*